**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

Marcus Fryar, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Moon Active Ltd.,

Defendant

Case No. 7:21-cv-01977

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Moon Active Ltd. ("defendant") develops and operates the mobile game "Coin Master," distributed across mobile platforms including Apple's iOS and Google's Android.

2. Coin Master is the second largest "social casino" game and has been downloaded over 100 million times.[1]

3. Coin Master encourages users to spend real money in the slot machine portion of its game to drive usage to build villages and attack those of other players.




[1] Wikipedia contributors. "Coin Master." Wikipedia, The Free Encyclopedia.

4. Coin Master's success is due to creating a game which incorporates traditional action, village-building and social aspects, but with gambling elements at its center.[2]

5. Unlike a regular casino, players of social casino games like Coin Master do not (subject to some exceptions) win real-money rewards for their spending.

6. However, users of social casino games like Coin Master often migrate to engagement in conventional gambling activities, with high rates of problem gambling.[3]

7. One North American study of teenagers found that over 12% had recently played social casino games and expended money to purchase additional playing time.

8. Social scientists have established clinically-significant links between social gaming and problem gambling behavior.

9. Because many players of Coin Master are under 18, there are special duties and responsibilities towards them which are established by state and federal law.

10. By marketing Coin Master to players under 18 who spend money on the game, Coin Master's violated those obligations.

11. German regulators even considered banning Coin Master recently but declined because German law did not specifically prohibit the mechanisms used by its gameplay.

12. Coin Master goes beyond the "social casino" category by promoting and profiting from prohibited gambling activity through the "Card Collection" feature.

---

[2] Lloyd Melnick, Yes, Coin Master is Disruptive, March 19, 2019.

[3] David Zendle, "Beyond loot boxes: a variety of gambling-like practices in video games are linked to both problem gambling and disordered gaming," *PeerJ* 8 (2020): e9466.




13. Players collect and trade cards to complete their card sets, which provide in-game advantages.

14. There is an active third-party market for the trade of these card sets, where players will exchange cards for money through third-party websites.

15. Coin Master is considered gambling under New York State law, defined as when:

> A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

New York Penal Law ("PEN") § 225 (sub 2) ("Gambling.")

16. New York State defined "something of value," in the context of gambling as:

> any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or *involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge*.

PEN § 225.00 (sub 6) (emphasis added).

17. While it may seem counterintuitive that paying money for something where the player knows the only thing they will receive back as value is more playing time, the statute was written with an understanding of how gambling activities operate and seek to stay one step ahead of regulators.

18. This was originally known as the "free replay" loophole.[4]

19. Traditionally, gambling involved games like cards, dice and roulette wheels, where the loss of money was apparent.

20. When states sought to limit this type of gambling, operators developed slot machines which no longer returned money but tokens that could be exchanged for money.

21. Additionally, to avoid restrictions from gambling laws, manufacturers of slot machines even attached merchandise vending machines which dispensed items of trifling value such as cheap candy or gum.

22. This circumvented gambling restrictions until states caught up and stopped it.

23. Pinball machines were the response to the crackdown on slot machines.

24. Though early pinball machines awarded tangible things of value to successful players, this caused them to be deemed gambling devices.[5]

25. Creative pinball operators again stayed ahead of the states and "restricted the reward to the awarding of free games to successful players."

26. States like New York recognized that "the intent behind the free game feature is to induce the playing of the machine."

27. In a standard scenario, the outcome from operating a pinball machine or other gaming device to receive additional playing time is random.

28. The player has no or little ability to affect the outcome of the game other than playing the game enough times that the laws of probability, and the preprogrammed circuitry, will allow them to eventually win additional "plays."

[4] Robert J. Hand, "Pinball Machines Which Award Free Games as Gambling Devices." Wyo. LJ 11 (1956): 163.
[5] The early pinball machines lacked "flippers" which introduced a clear element of skill, i.e., hand-eye coordination, reflexes, etc.

29. Players of Coin Master are, in theory, subject to the same forces of chance.

30. To build their villages or attack the villages of other players, users must spin the slot machine to win coins.

31. Five free spins are given every hour, which means that it can take several hours to generate enough coins to continue playing.




32. Users can continue to play if they buy more spins to possibly get more coins.[6]

33. However, Coin Master's tactics are said to go beyond "randomness" and involve tilting the scales in the favor of the "house."

34. Numerous reports describe players who spend more money buying spins getting the ability to raid villages with higher volumes of coins, which is not disclosed.

35. This is intended to "penalize" those who do not purchase spins and cause those who

[6] Om Tandon and Abhimanyu Kumar, How Coin Master Disrupted Social Casino and Pocketed $100M, March 4, 2019, Deconstructor of Fun; Matt Suckley, How does Coin Master monetise? IAPs from the players' perspective, The IAP Inspector, Feb. 7, 2018

do purchase spins to buy and spend more.

36. Critics have charged that Coin Master calculates the number of spins a player needs to obtain a prize, such as a Santa Hat, and rigs the outcome so the player expends the maximum amount of money possible in pursuit of such prize.

37. Additionally, there are constant stories of players who come up just short of the coins needed to upgrade their status and position in the game, which forces the purchase of more spins.

38. These tactics mislead players who think the game operations are random when the goal is to maximize the money spent by players.

39. However, even if the dynamics of the game are random, they still involve the unlawful expenditure of money for additional game play.

40. Only Coin Master's tactics go beyond those conceived by the pinball machine makers of old.

41. Consistent with the restrictions on gambling, General Obligations Law ("GOL") § 5-421 provides that:

> Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof.

42. Plaintiff and class members seek such recovery as permitted to them by New York State law for playing Coin Master and paying money for extra spins to continue playing it.

## Parties

43. Plaintiff Marcus Fryar is a citizen of Newburgh, Orange County, New York.

44. Defendant Moon Active Ltd. is a corporation with a principal place of business in Tel Aviv.

45. Defendant is developer of mobile game applications sold and installed through "app

stores" for mobile devices, such as Apple's App Store and the Google Play Store.

46. Plaintiff Marcus Fryar played the Coin Master game within this district, at least over the past year, from his Apple device.

47. Plaintiff paid at least twenty-five dollars ($25) for extended "free play" within the past three months and at least two hundred dollars overall.

48. Plaintiff seeks injunctive relief because he is at-risk of continuing to use Coin Master due to its addictive game mechanics.

Jurisdiction and Venue

49. Jurisdiction is proper pursuant to the Class Action Fairness Act of 2005 ("CAFA") as the amount in controversy is at least $5 million and there is minimal diversity. 28 U.S.C. § 1332(d)(2).

50. Plaintiff Marcus Fryar is a citizen of New York.

51. Defendant Moon Active Ltd. is an Israeli limited corporation with a principal place of business in Tel Aviv, Israel.

52. Diversity exists because plaintiff Marcus Fryar and defendant are citizens of different states, and defendant is considered a citizen of a foreign state.

53. In 2019 and 2020, Coin Master earned over $1 billion, with over half from the United States.[7]

54. Based on New York's population – six percent of the United States – it is reasonable to estimate that Coin Master received approximately $60 million from citizens of New York over the past two years.

[7] Staff Reporter, Predicting the Next Social Game Sensation: How Coin Master Took Us By Surprise, Dec 30, 2019 GamenGuide.

55. Therefore, the available statutory and other monetary damages exceed $5 million during the applicable statutes of limitations, exclusive of interest and costs.

56. The Court has jurisdiction over defendant pursuant to CPLR § 302(a)(l) because the Coin Master application is interactive and designed to be used by, and is used by, New York citizens.

57. Defendant transacts business within the state through receiving money from players such as Plaintiff.

58. Through the Coin Master game, individuals can register an online account or link their Facebook account, to facilitate use of the game.

59. Users are charged through the payment methods they have added to their accounts with the "app stores" provided by Apple and Google.

60. Defendant receives these funds from Apple, Google and other similar companies which distribute the Coin Master application.

61. Defendant has purposefully availed itself of the privilege of conducting activities within New York, invoking the benefits and protections of its laws but also the responsibilities under them.

62. The causes of action alleged are derived from these transactions by Coin Master.

63. As defendant is an unauthorized foreign corporation, the New York Secretary of State is designated by statute as its agent for service of process. BCL § 307.

64. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred here, as Plaintiff Marcus Fryar used Coin Master and made the payments that are the subject of this action in this district.

Class Allegations

65. The class will consist of all citizens of New York who paid money for extended play of the Coin Master application

66. Plaintiff seeks class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

67. Common questions of law or fact predominate and include whether defendant's practices were gambling under New York law and if plaintiff and class members are entitled to recovery of monies spent.

68. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unlawful gambling mechanisms of Coin Master.

69. Plaintiff is an adequate representative because his interests do not conflict with other members.

70. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

71. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

72. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

73. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York GOL § 5-421
Recovery of Sums Paid

74. Plaintiff incorporates by reference all preceding paragraphs.

75. Plaintiff and class members seek recovery of money paid to defendant through the Coin Master app.

New York General Business Law ("GBL") §§ 349 & 350
(Consumer Protection Statutes)

76. Plaintiff incorporates by reference all preceding paragraphs.

77. Plaintiff and class members desired to play a game which did not constitute gambling and was lawful and would not lure them to spend increasing amounts of money, with a "return" which was not even random but manipulated so they spent more money.

78. Defendant's acts and omissions in the marketing and design of Coin Master has a broader impact on the public than just affecting Plaintiff.

79. Defendant intended that plaintiff and class members rely on representations it was a lawful game.

80. Plaintiff and class members were misled and/or deceived.

81. Plaintiff and class members would not have played the Coin Master game if the true facts had been known, suffering damages.

Unjust Enrichment

82. Plaintiff incorporates by reference all preceding paragraphs.

83. Defendant obtained benefits and monies because Plaintiff and class members were induced to spend money through trickery and manipulation, in violation of law and seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing defendant to correct the

challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;
4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;
5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and
6. Other and further relief as the Court deems just and proper.

Dated: March 7, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com

7:21-cv-01977
United States District Court
Southern District of New York

Marcus Fryar, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Moon Active Ltd.,

Defendant

Class Action Complaint

Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: March 7, 2021

/s/ Spencer Sheehan
Spencer Sheehan